MITCHELL (DENNETT v.). See Case No. 3,789.

## Case No. 9,662.

### MITCHELL v. GREAT WORKS MILLING & MANUF'G CO.

[2 Story, 648.] [1]

Circuit Court, D. Maine. Oct. Term, 1843.

CREDITOR'S BILL—ACCOUNT—CONCURRENT JURISDICTION — BANKRUPTCY — ENTIRE SETTLEMENT AND DISTRIBUTION—CONSTITUTIONAL LAW—AUTHORITY TO ENACT BANKRUPT LAW.

1. Certain persons associated themselves together, under the name of the "Wilson Mill Privilege," and appointed A. and B. as their agents and attorneys, who took charge of their property, and erected buildings, and made improvements, and advanced money; afterwards, they obtained a charter and incorporation as "The Great Works Milling and Manufacturing Company," and voted to settle all the accounts of the agents, and ratified their proceedings, and continued A. as their agent; but no settlement of the agents' accounts was ever made; and the present bill being brought by their assignee, it was *held*, that it was a proper case for the interposition of a court of equity.

2. In matters of account courts of equity possess a concurrent jurisdiction with courts of law, in most, if not in all cases, and where the case is one wherein a court of law could not afford an adequate redress, it is proper for the interposition of a court of equity.

[Cited in Duryee v. Elkins, Case No. 4,197; Re Strauss, Id. 13,532; Perry v. Corning, Id. 11,003; Gaines v. City of New Orleans, 17 Fed. 19; Pacific R. R. v. Atlantic & P. R.

---

[1] [Reported by William W. Story, Esq.]

Co., 20 Fed. 279; Herrick v. Throop, 24 Fed. 535.]

[Cited in Tillar v. Cook, 77 Va. 480.]

3. Under the bankrupt act of 1841, c. 9 [5 Stat. 440], the circuit and district courts have full jurisdiction in equity, in respect to all cases arising in bankruptcy, to do all which is necessary and proper to accomplish the entire settlement and distribution of the bankrupt's estate, whether the proceedings be formal or summary.

[Cited in Re Wallace, Case No. 17,094. Approved in Pritchard v. Chandler, Id. 11,436; Goodall v. Tuttle, Id. 5,533. Doubted in Smith v. Crawford. Id. 13,030, and Bachman v. Packard. Id. 709, as to the jurisdiction of the circuit court.]

4. Congress have a complete constitutional authority to enact a bankrupt act, giving to the district and circuit courts full jurisdiction in law and equity.

5. Congress has no right to require. that the state courts shall entertain suits for the objects and purposes to be carried into effect by the bankrupt act.

[Cited in Goodall v. Tuttle, Case No. 5,533; Sherman v. Bingham, Id. 12,762.]

[6. Cited in Sutherland v. Lake Superior Ship Canal, Railroad & Iron Co., Case No. 13,643. and cited in brief in Norton v. Barker, Id. 10,349, to the point that a lien holder is an adverse claimant.]

[7. Cited in Payson v. Dietz, Case No. 10,861, to the point that state courts are not deprived of jurisdiction in ordinary common-law and equity suits, simply because brought by the assignee in bankruptcy.]

[8. Cited in Walker v. Towner, Case No. 17,089, to the point that the two-years limitation in the bankrupt act applies to suits by assignees to collect the debts and assets of the estate, as well as to suits relating to specific property.]-

[9. Cited in Ward v. Jenkins, 10 Metc. (Mass.) 590, and cited in brief in Pike v. Crehore, 40 Me. 509, to the point that the bankrupt law vests all the property in the assignee, and confers upon him as full power to sue as the bankrupt has; and that this property right includes all debts due the bankrupt.]

Bill in equity. The bill was brought by Nathaniel Mitchell, of Portland, assignee in bankruptcy of Seth Paine, Jr., and John L. Meserve, both of said Portland, formerly partners under the name and firm of Paine & Meserve, against the Great Works Milling and Manufacturing Company. It sets forth, that Enoch Paine, Josiah S. Little, Seth Paine, Junior, and John L. Meserve, all of Portland, and state of Maine, and Joseph B. Hervey, of Newburyport, Massachusetts, having, before the time hereinafter mentioned, formed themselves into a voluntary association, and being then and there the owners of certain real estate in the county of Penobscot, known as the "Wilson Mill Privileges," did, on the twenty-second day of June, 1835, by an agreement in writing between themselves, duly signed and sealed. appoint Seth Paine, Junior, and John L. Meserve aforesaid, to be their agents and attorneys, to act on the matters aforesaid, on behalf of all of said parties, a copy of which said agreement is annexed, and made part of the bill. That on the twenty-seventh of July, 1835, Joseph W. Hale, Francis B. Todd, and Nathaniel F. Deering, all of Portland, became the purchasers of one undivided twelfth

part each of the aforesaid property, and that Edmund L. D. Breton, at Bangor, on the seventh of August, 1835, also became the purchaser of one undivided twelfth part of the said property, and that the said Hale, Todd, Deering, and Breton, by a writing to that effect, under their hands on the back of said agreement, consented and agreed to be bound by the said agreement in the same manner as if they had been originally parties thereunto; and the said Paine and Meserve having been duly appointed, as above set forth, the agents and attorneys for the Wilson Mill Privilege Association, took upon themselves that trust, and continued in that capacity until the dissolution of said association, and that they went on to the property, and caused extensive improvements to be made, and buildings to be erected thereon, in pursuance of the instructions, and in carrying out the intentions of the members of said association; during the progress of which improvements, the said Paine and Meserve were at great personal expense, and laid out and advanced large sums of money, for the benefit of said association; in consequence whereof the said association became greatly indebted to the said Paine and Meserve. And that the said association ratified and confirmed the said actings and doings of said Paine and Meserve. That they petitioned the legislature of the state of Maine for an act of incorporation, which was granted in 1831, incorporating Enoch Paine, Nathaniel F. Deering, E. M. Wildredge, John L. Meserve, Joseph W. Hale, Joseph B. Hervey, Josiah S. Little, Francis B. Todd, and their associates, being the associates aforesaid, owners of said Wilson Mill Privileges, by the name of the Great Works Milling and Manufacturing Company, and that the said Paine and others, the associates aforesaid, accepted the charter of incorporation, and transferred and conveyed all their interest in the property of the association to the Great Works Milling and Manufacturing Company, which last mentioned company accepted the transfer, and in consideration thereof, they undertook and promised to pay, meet, or adjust, all the debts and liabilities of said voluntary association; and that afterwards, at an adjourned meeting of the stockholders of the Great Works Milling and Manufacturing Company, held on the twenty-third day of May then next, it was voted, that the directors be authorized to settle all the accounts of the agents and attorney of the proprietors, and that the doings and contracts of the attorney of the proprietors be hereby ratified and confirmed, the said proprietors being said associates, and the proprietors of the Wilson Mill Privileges, and designated in said vote as proprietors, in contradistinction to the stockholders, as such, in the said corporation; that, at a directors' meeting of the directors of the said corporation, held the twenty-fourth day of May, 1836, it was "voted, that Mr. Seth Paine, Jr., be requested to proceed to the establishment of the company, and, in behalf

of the directors, to assume the agency and direction of the business of the company, and report his doings to the directors." And that, in pursuance of this vote and authority, the said Paine continued to act in the capacity of agent for said company, and, in the discharge of the duties of said office, laid out, and advanced, and expended large sums of money for the benefit of the said corporation; in consequence whereof the said corporation became greatly indebted to the said Paine. That in the month of September, 1837, there was an attempt made to settle the account between Seth Paine, Jr. and the Great Works Milling and Manufacturing Company, and, at the same time, Paine and Meserve presented their account against the Great Works Milling and Manufacturing Company, which account was not disputed; but a certain amount due from the said Paine and Meserve was allowed towards payment of it. And that, afterwards, another attempt was made at settlement; but the parties did not make any adjustment at that time, nor have the said Paine and Meserve, nor the said Paine, been able to obtain a settlement to this time; although the said Paine and Meserve have been ready, and frequently solicited an adjustment; but that the corporation have delayed and refused, from time to time, to make any such settlement, and still refuses so to do. And, although the said Seth Paine, Jr. was constituted the agent of the said corporation, yet the said Paine being, in fact, in company with the said Meserve, and acting, as well for said Meserve as for himself, the said Paine, in all his acts, making advances, and superintending, and directing the business of said company, agreeably to said vote of May 24th, 1836, acted as a member of and for the joint interest of said firm. And that all sums of money, due, on account of such agency, and such disbursements and expenditures of said Paine, are in fact, in equity, and good conscience, due to said Paine and Meserve. And that there is, in fact, due to said Paine and Meserve, on a fair and equitable adjustment of accounts, from said corporation, a large sum of money, to wit, 2,310 dollars, with interest thereon. All which actings and doings of the said Great Works Milling and Manufacturing Company, in their own behalf and on behalf of the Wilson Mill Privileges Association, are contrary to equity and good conscience, and tend to the manifest wrong and injury of the plaintiffs in the premises. In consideration whereof, and forasmuch as the plaintiff is remediless in the premises in and by the strict rules of the common law, and cannot have adequate relief save in a court of equity, where matters of this and the like nature are properly cognizable and relievable, the plaintiff prays for a writ of subpoena in due form of law, directed to the Great Works Milling and Manufacturing Company and to the proper officers of said corporation, or in such other manner as this honorable court shall direct, thereby commanding the said corporation, by its proper officers, or in such manner as this court shall direct, to appear before your honors at a certain day, then and there to answer the premises, and to stand and abide such order and decree therein as shall be agreeable to equity and good conscience.

To this bill a demurrer was filed, and the cause was argued upon the demurrer by W. Pitt Fessenden, for the company.

Wm. P. Preble, for plaintiff.

STORY, Circuit Justice. Two objections have been taken, on the part of the defendants: (1) That the matter of the bill, although for an account, is completely remediable at law, and, therefore, not the fit subject matter of a bill in equity. (2) That the circuit court has not jurisdiction in this case in bankruptcy under the bankrupt act of 1841 (chapter 9). In the judgment of this court, neither objection is maintainable; and I will shortly proceed to state the reasons of this determination. As to the first objection, it is certainly true, that, in matters of account, courts of equity possess a concurrent jurisdiction, in most if not in all cases, with courts of law. In the present case, taking the statements of the bill to be true, which we must upon the demurrer, it seems to us not only clear, that it is a case fit for the interposition of a court of equity, but that it is emphatically so, as one where a court of law could not render any justice in the matter; or, if any, it must be a very crippled and imperfect redress. It is, indeed, impossible to read the bill and not to feel, that some of the claims there set up, considering the complications and changes of interests of the parties, cannot be adequately examined or properly disposed of except in a court of equity. But the more material consideration is that, which respects the jurisdiction of this court to maintain the bill under the bankrupt act of 1841 (chapter 9), as it is a case, which would not otherwise fall within its general jurisdiction. At the threshold of the argument, we are met with the suggestion, that when the act was before congress, the opposite doctrine was then maintained in the house of representatives, and it was confidently stated, that no such jurisdiction was conferred by the act, as is now insisted on. What passes in congress upon the discussion of a bill can hardly become a matter of strict judicial inquiry; and if it were, it could scarcely be affirmed, that the opinions of a few members, expressed either way, are to be considered as the judgment of the whole house, or even of a majority. But, in truth, little reliance can or ought to be placed upon such sources of interpretation of a statute. The questions can be, and rarely are, there debated upon strictly legal grounds, with a full mastery of the subject and of the just rules of interpretation. The arguments are generally of a mixed character, addressed by way of objection, or of support, rather

with a view to carry or defeat a bill, than with the strictness of a judicial decision. But if the house entertained one construction of the language of the bill, non constat, that the same opinion was entertained either by the senate or by the president; and their opinions are certainly, in a matter of the sanction of laws, entitled to as great weight as the other branch. But in truth, courts of justice are not at liberty to look at considerations of this sort. We are bound to interpret the act as we find it, and to make such an interpretation as its language and its apparent objects require. We must take it to be true, that the legislature intend precisely what they say, and to the extent which the provisions of the act require, for the purpose of securing their just operation and effect. Any other course would deliver over the court to interminable doubts and difficulties; and we should be compelled to guess what was the law, from the loose commentaries of different debates, instead of the precise enactments of the statute. Nor have there been wanting illustrious instances of great minds, which, after they had, as legislators, or commentators, reposed upon a short and hasty opinion, have deliberately withdrawn from their first impressions, when they came upon the judgment seat to re-examine the statute or law in its full bearings.

Passing from these considerations, which have been drawn from us by the suggestions at the bar; let us look at the actual provisions of the bankrupt act of 1841 (chapter 9). And here, in order to ascertain the jurisdiction of the circuit court, we must first examine what is the jurisdiction given to the district court. The 6th section of the act declares: "That the district court in every district shall have jurisdiction in all matters and proceedings in bankruptcy, arising under this act, and any other act, which may hereafter be passed on the subject of bankruptcy; the said jurisdiction to be exercised summarily, in the nature of summary proceedings in equity." And then, not by way of restriction, but of explanation, if not of enlargement of the objects of this jurisdiction, it proceeds to declare: "And the jurisdiction hereby conferred on the district court shall extend to all cases and controversies in bankruptcy, arising between the bankrupt and any creditor or creditors, who shall claim any debt or demand under the bankruptcy; to all such creditor and creditors, and the assignee of the estate, whether in office or removed; to all cases and controversies between such assignee and the bankrupt; and to all acts, matters, and things to be done under and in virtue of the bankruptcy, until the final distribution and settlement of the estate of the bankrupt, and the close of the proceedings in bankruptcy." Now, it seems to us, impossible to doubt, that the object of these clauses, which are sufficiently broad and comprehensive for the purpose of giving the district court complete jurisdiction to ac-

complish, of itself, all the purposes of the act, and to enable it, independently of any other jurisdiction, to begin, continue, and end, all such proceedings as might be necessary and proper, in an equitable view, to accomplish the entire settlement and final distribution of the bankrupt's estate. To us it seems perfectly clear, that congress possess a complete constitutional authority to enact such a law for such an object; for the judicial power, by the constitution, extends "to all cases in law and equity, arising under this constitution and the laws and treaties made, or which shall be made under their authority;" and further, congress are authorised by the constitution, "to pass uniform laws on the subject of bankruptcies throughout the United States." The judicial power has, in this respect, under the constitution, always been construed to be co-extensive with the legislative powers, upon the plain ground, that the constitution meant to provide ample means to accomplish its own ends by its own courts. Now, looking to the many objects and purposes of the bankrupt act of 1841 (chapter 9), it would seem strange, that congress should not have provided all the necessary and proper means to accomplish all its purposes. It is clear, that congress has no right to require, that the state courts shall entertain suits for such objects and purposes. The states, in providing their own judicial tribunals, have a right to limit, control, and restrict their judicial functions, and jurisdiction, according to their own mere pleasure. They may refuse to allow suits to be brought there "arising under the laws of the United States" for many just reasons; first that congress are bound to provide such tribunals for themselves; secondly, that state courts are not subject to the legislation of congress as to their jurisdiction; thirdly, that it may most materially interfere with the convenience of their own courts, and the rights of their own citizens, and be attended with great expense to the state, as well as great delays in the administration of justice, to allow their courts to be crowded with suits, arising under the laws of the United States; and fourthly, as in the present case, that it would involve the state courts in almost endless examinations and discussions of the principles and bearings of the bankrupt law, confessedly a system novel in our jurisprudence, intricate in its details, and involving questions exceedingly complicated and difficult in its practical operation. Suppose, upon considerations of this sort, any state legislature should prohibit its own courts from taking cognizance of any causes arising under the bankrupt act, no one could doubt, that it was a perfectly constitutional exercise of authority, and not justly to be complained of, as a want of comity or of justice. A due regard of a state to its own rights, and its duties to its own citizens, might require such a course, in order to prevent oppressive delays, and obstructions in the actual administration of

home justice; and, at all events, might justify it in preferring such claims to those, belonging appropriately to the national jurisdiction. Besides all these considerations, there is one, which cannot but be deemed of paramount importance in the administration of a system of bankruptcy. It is uniformity, promptitude, regularity, and efficiency in carrying into effect all its provisions. The courts, which are to administer such a system, must possess not only jurisdiction at law, but in equity; not only a right to proceed in a formal way, but to act summarily; not only to hold regular terms, but to be always open; not only to be bound to act, but to be governed by uniform rules and principles of interpretation and action, at least, as far, as from the diversity of human judgments, such uniformity of rules, principles, and proceedings, can be looked for in practice. But what can be expected from a hundred of state courts, organized upon no uniform system, governed by no uniform jurisprudence, and in their jurisdiction and modes of proceeding, admitting of almost endless diversities of practice and action? So far from any system of bankruptcy being capable of any uniformity of action throughout the United States, under such circumstances, it would be in no two states, perhaps in no two tribunals of the same state, the same. And if every decision in a state tribunal was to be subject to the appellate jurisdiction of the supreme court of the United States, instead of the proceedings in bankruptcy being completed, as the act of 1841 (chapter 9, § 10) manifestly contemplates, within two years from their commencement, a half century might elapse before such a consummation.

Now, it is precisely because considerations of this sort could not be supposed to escape the notice of congress, but must have pervaded the whole purposes of legislation on the subject of bankruptcy, that we should be utterly surprised, if adequate provisions were not made in the act of 1841 (chapter 9) to carry the entire system into effect, through the instrumentality of the courts of the United States, over which congress possess a complete authority, subject to no foreign control, or government, or obstruction. It was not necessary to say, that the courts of the United States should possess exclusive jurisdiction. It was only necessary to say, that they should possess full jurisdiction, and to leave to the state courts the exercise of any concurrent jurisdiction, which they could or might rightfully maintain. In this way, it would naturally follow, that after a little experience in the workings of the system, with the aid of some amendments by congress, the courts of the United States would soon attain punctuality, uniformity, and promptitude, in administering the system, so as to accomplish in the fullest manner all the ends of private, as well as of public justice.

Now, as it seems to us, this very object was designed to be attained, and can be attained, by the provisions of the 6th section of act of 1841 (chapter 9), already cited, if we give to the words their natural, and appropriate meaning, and infuse into them no subtleties, or doubts, or refinements, grounded upon the supposed intentions of congress, or upon technical doctrines, or upon particular local policy. If ever there can be a case for the application of a liberal interpretation of an act from its apparent objects, as well as from the argument ab inconvenienti, it seems to us, that this is the very case which will most forcibly illustrate its propriety and cogency. Let us look for a moment at some of the provisions of the act to see, what the courts, sitting in bankruptcy, are required to do. We have already seen, by the 10th section of the act of 1841, that it is required, "That all the proceedings in bankruptcy in each case shall, if practicable, be finally adjusted, settled and brought to a close by the court within two years after the decree declaring the bankruptcy." How is this to be done, unless the court possesses jurisdiction, co-extensive with all the subject matters in bankruptcy, to enforce and adjust all claims? How can this be enforced, if the entire jurisdiction to collect debts, and to settle controversies in bankruptcy, belongs exclusively to the state courts? What control can the courts of the United States, sitting in bankruptcy, exercise over the state courts to regulate, or to speed their proceedings? Besides, the same section of the act declares: "That, in order to insure a speedy settlement and close of the proceedings in each case of bankruptcy, it shall be the duty of the court to order and direct a collection of the assets, and a reduction of the same to money, and a distribution thereof, at as early periods as practicable, consistently with a due regard to the interests of the creditors." Now, here the end is required of the court; and can it reasonably be doubted, that the means are also given to the court to accomplish it? Construe the clause in the 6th section of the act of 1841, where it extends the jurisdiction of the district courts "to all acts, matters, and things to be done under, and in virtue of the bankruptcy, until the final distribution, and the settlement of the estate of the bankrupt, and the close of the proceedings in bankruptcy," to include the jurisdiction to entertain suits to adjust all adverse claims, and to collect all outstanding debts (as its terms are sufficiently comprehensive to include), and we have exactly such a jurisdiction, commensurate to the end. Construe it otherwise, and the court sitting in bankruptcy is left crippled and maimed; and we require it to move onward, when it it chained to the earth.

These are some of the grounds, which satisfy our minds, that congress did not intend to leave the bankrupt system, for its practical operation, or success, or efficiency, to the good pleasure, or discretion of the states, or to their voluntary and gratuitous efforts to

enforce or sustain it.' Congress meant to provide a system capable of entire self-execution by the national tribunals, without the assistance or co-operation of the states, if the parties interested should choose to rely upon the national arm. The jurisdiction given to the district courts is, as we construe it, ample for all such purposes; and we see no reason, why the general language, in which it is given, should be restricted, so as to defeat a single purpose of the act.

Such then being in our judgment the jurisdiction given by the act of 1841 (chapter 9) to the district courts, we are next led to the consideration of the jurisdiction of the circuit court; and if, as we think, the district court would have complete jurisdiction of the present case, we think that there can be no doubt that this court also possesses it under the 8th section of the bankrupt act of 1841 (chapter 9). That section declares: "That the circuit court within and for the district, where the decree of bankruptcy is passed, shall have concurrent jurisdiction with the district court of the same district of all suits at law and in equity, which may and shall be brought by any assignee of the bankrupt against any person or persons claiming an adverse interest, or by such persons against such assignee, touching any property or rights of property of said bankrupt, transferable to or vested in such assignee." Now, there cannot be a doubt, that a debt claimed by and due to the bankrupt from any person is "a right of property" in the bankrupt. Every chose in action is a right of property, assignable in equity, if not at law (see Gray v. Bennett, 3 Metc. [Mass.] 522, 531); and it is clearly assignable under the bankrupt act; for that act declares (section 3) that upon the decree in bankruptcy, "All the property and rights of property, of every name and nature, real, personal, or mixed, of every bankrupt, &c., shall be deemed vested by force of the same decree in the assignee," &c.; and the assignee, is by the same section vested with full power and authority to sue for the same, as fully, to all intents and purposes, as the bankrupt himself might at the time of his bankruptcy. The debtor in every such case is necessarily in the sense of the act an adverse party; if he were not, he would pay the debt or claim; and his very resistance of it, upon suit brought, shows him to be, in form as well as in fact, an adverse party. So that, upon the plain terms and import of the section, the jurisdiction of the circuit court would become unquestionable in the present case. And, indeed, as it is a concurrent jurisdiction with the district court (designed doubtless to aid that court in cases of grave doubt and difficulty), it also shows, that this very class of cases was deemed to be within the jurisdiction of the district court, by and in virtue of the 6th section of the act already referred to. Each section reflects a strong light upon the other, and establishes the intention of congress to be, that its own courts should possess a plenary jurisdiction over all cases and controversies, connected with and growing out of any bankruptcy. See same point, Ex parte City Bank of New Orleans, 3 How. [44 U. S. 292].

Upon the whole, our opinion is, that the demurrer should be overruled.